**UNITED VAN LINES, INC., King Van Lines, Inc.**

v.

**The UNITED STATES.**

No. 203–63.

United States Court of Claims.

Dec. 17, 1965.

Francis Forti, Washington, D. C., for plaintiffs.

John Charles Ranney, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE and COLLINS, Judges, and JONES, Senior Judge.

DURFEE, Judge.

Plaintiffs seek to recover a sum representing the balance of freight charges allegedly due on shipments of household goods which were transported on behalf of defendant by plaintiffs. The parties have entered into a Stipulation of Facts, and these facts germane to the resolution of the case are included in the opinion.

Plaintiffs, United Van Lines and King Van Lines (hereinafter referred to as United and King, respectively) are, and at all times hereinafter mentioned were, engaged in the transportation of household goods in interstate commerce as common carriers by motor vehicle. United was a member of the Household Goods Carriers Bureau (hereinafter Household) which was authorized to publish tariffs and issue quotations of rates for its members (totaling approximately 1,700 motor carriers of household goods and agents thereof) under authority granted by the Interstate Commerce Commission. King, likewise, belonged to an association which acted as its agent—the Movers' and Warehousemen's Association of America, Inc. (hereinafter Movers). Movers was also authorized to publish tariffs and issue quotations of rates for its members (totaling approximately 600 motor carriers of household goods, movers and warehousemen) under authority granted by the Interstate Commerce Commission.

Prior to the events which led up to the present controversy, each plaintiff had executed a power of attorney to its

rate agent which authorized the respective agents to publish and file tariffs for plaintiffs. United's Power of Attorney read as follows:

United Van Lines, Inc. (A Missouri Corporation) a common carrier of property by vehicle, does (do) hereby make and appoint Household Goods Carriers' Bureau attorney and agent to publish and file for such carrier mileage and freight rate tariffs and supplements thereto, as permitted or required of common carriers of property by motor vehicle under authority of the Motor Carrier Act, 1935, and the regulations of the Interstate Commerce Commission issued pursuant thereto and does (do) hereby ratify and confirm all that said attorney and agent may lawfully do by virtue of the authority herein granted and does (do) hereby assume full responsibility for the acts and failure to act of said attorney and agent.

King's Power of Attorney to Movers was essentially the same.

On September 21, 1961, Movers sent a letter to all carriers that it represented who transported household goods for the Department of Defense, including King. The letter suggested the feasibility of a uniform rate covering the transportation of household goods for the military. The practice until that time had been for each carrier to submit individual quotations or tenders to the Department of Defense. The letter of September 21, 1961, stated in part:

* * * it has been proposed that the Association reissue its Military Rate Tender No. 1 for the account of all participants, in order to eliminate the disorganization of the present tender, and, as has always been the policy of the Association, to bring the Tender into conformity with the tariff publications of the Association since this has been only partially accomplished in the reissue of Sections II and III in Supplement

No. 18 to Military Rate Tender No. 1.

Therefore, unless this office is in receipt of your written instructions to the contrary, on or before October 5, 1961, preparation for such republication of Military Rate Tender No. 1 for your firm's account shall proceed to its conclusion and proposed filing date for such reissuance will be on or about November 1, 1961, to become effective upon the earliest acceptance date by MTMA.

In accordance with the last paragraph of the above letter, Supplement No. 1 to Military Rate Tender I.C.C. No. 1-R was prepared and reads in part as follows:

APPLICABLE FOR ACCOUNT OF CARRIERS LISTED IN SECTION I

As of the acceptance date of this Tender of Rates and Charges, All Tenders applicable to the transportation of household goods and personal effects (Except commodities itemized in Section VI) previously filed with MTMA for the account of the DEPARTMENTS OF THE ARMY, AIR FORCE AND NAVY, AND MARINE CORPS AND COAST GUARD when moving on a Government Bill of Lading, by and for the account of the individual carriers named in SECTION I, as amended are hereby CANCELLED AND SUPERSEDED.

The Supplement stated that it was issued October 21, 1961, and was to become effective December 5, 1961.

On November 13, 1961, Movers directed another letter to all participating carriers listed in its proposed Military Rate Tender I.C.C. No. 1-R. The letter informed the carriers that they still had the right of independent action under the Interstate Commerce Act. See 49 U.S.C. § 5b(6) (1958 ed.) (fn. 1, infra.) The letter read, in part:

We also want to remind you that Military Rate Tender I.C.C. No. 1-R as of December 5, 1961, will cancel and supersede " * * * All tenders * * * previously filed

with MTMA for the account of the Departments of the Army, Air Force and Navy, and Marine Corps and Coast Guard when moving on a Government Bill of Lading, by and for the account of the individual carriers named in Section I, * * *"

This Agency filing does not preclude the right of carrier's independent action with respect to its privileges under Section 22 of the Interstate Commerce Act. In other words, on and after December 5, 1961, this Tender of Rates and Charges will be the accepted Section 22 filing for each and every carrier listed therein, unless independent exceptions are taken by the individual carriers through procedures established and required by MTMA, Washington, D. C.

In the meantime, Household (United's rate agent) had also been exploring the feasibility of the use by all carriers of a uniform rate for the transportation of household goods for the military. As a result of the foregoing, Household wrote all participating carriers on November 23, 1961, in pertinent part as follows:

Following prolonged discussion with the Military Traffic Management Agency, they have agreed to accept a supplement to Military Rate Tariff 1–A to be issued December 1st, effective December 5th that would direct cancellation of individual rate tenders filed by the participants in Tariff 1–A applying on the movement of personal effects of military personnel between points within the United States.

* * * * * *

This will mean that on and after December 5th, all carriers, members of the Bureau and members of M&WAA will be on the same rate level for domestic military shipments, namely the rate in MRT 1–A and that any exceptions previously filed would be cancelled. This, of course, would not prohibit carriers from filing exceptions to the Mili-

tary Rate Tariffs after the December 5th date, as this Bureau, under provisions of its 5A agreement cannot do anything that would preclude the right of individual action on the part of its members.

In view of the time element involved, we are invoking the modified procedures set forth in the By-Laws, requesting that carriers notify this office within five (5) days from the date of this letter if they are not in agreement with the proposed supplement. If you are in agreement, you need not reply and we will proceed with the filing as outlined above.

According to Household, and we have no reason to believe to the contrary, there were no carriers who disagreed with the above proposal. Therefore, Supplement No. 5 to Military Rate Tariff No. 1–A was prepared to incorporate the above mentioned proposal. It is almost identical to Supp. No. 1 to Military Rate Tender I.C.C. No. 1–R, supra.

After numerous meetings with plaintiffs' agents and prior to the issuance of Supp. No. 1 to Military Rate Tender I.C.C. No.1–R and of Supp. No. 5 to Military Rate Tariff No. 1–A, the Military Traffic Management Agency (MTMA) of the Department of Defense agreed to the blanket cancellations of individual rate tenders issued theretofore by the member carriers. Formal approval was thereafter given and on December 5, 1961 MTMA stamped an acceptance notice on each supplement.

About the time the two new supplements were issued, a dispute arose between the General Accounting Office and MTMA as to the legal effect of the blanket cancellation notices contained in the supplements. The dispute was apparently resolved by February 14, 1962, as on that date the Defense Traffic Management Service (successor to MTMA) wrote Household and Movers as follows:

This has reference to our letter of 8 December 1961, and your reply of 14 December, 1961, regarding the filing of Military Rate Tender I.C.C.

No. 1–R[1–A] and the fact that this tender has the effect of cancelling or superseding all previous individually issued tenders on file with the Defense Traffic Management Service (DTMS) by those carriers named in Section I therein.

\*   \*   \*   \*   \*   \*

In a meeting with the General Accounting Office on this subject, it was determined that they are of the opinion that you did not effectively cancel out individual tenders by general references on the title of your superseding consolidated tenders, and that, their audit would have to give effect to the individual tenders so long as they remained available; that is, so long as they were not cancelled by notice from the individual carrier to the party to whom the tender was made in the first place.

In view of this position of the General Accounting Office, it appears necessary for the carriers who made individual issues to make their own cancellations and not rely on the blanket cancellation contained in MRT 1–R.

Future blanket cancellation notices of this type will not be accepted. The current policy of DTMS that tenders must be cancelled by the individual supplement or tender making specific reference to the tender being cancelled will be enforced.

During the period that all parties thought that the two supplements, Supp. No. 1 to Military Rate Tender I.C.C. No. 1–R and Supp. No. 5 to Military Rate Tariff 1–A, were in effect, plaintiffs were paid the rates listed in those tariff supplements. Those rates were higher than the pre-December 5 (pre-supplement) rates. When an audit of plaintiffs' bills were made by the G.A.O., after determination that the two supplements were invalid, defendant determined that the transportation charges thereon had been overcharged to the extent that said charges exceeded those computed on the basis of rates offered by plaintiffs in their respective individual Rate Tenders filed prior to December 5, 1961. These overcharges were then collected by defendant. In this suit, plaintiffs ask for a return of the sums collected ($5,270.88 from United, and $1,491.81 from King) by defendant.

It is plaintiffs' position, (1) that their respective individual rate tenders on household goods in effect prior to December 5, 1961 were effectively cancelled on that date by the respective agency publications, the two supplements, and (2) that thereafter only the rates in said agency publications were applicable on the shipments in controversy. It is defendant's position that (1) the authority of the agents, as approved by the Interstate Commerce Commission, was not broad enough to clothe the agents with the power of binding the individual members of their associations insofar as cancellation of the members' (plaintiffs') separate tenders are concerned, and (2) that even if the agents had such authority, the tenders were not properly cancelled in accordance with the Interstate Commerce Commission regulations.

■ This court feels that the position taken by plaintiffs is correct. An examination of the correspondence and documents between the parties reveals with clarity the strength of plaintiffs' position. By power of attorney, both Household and Movers were authorized to publish and file freight rate tariffs and supplements for its members. Acting under authority of this power, Movers and Household wrote their respective members, including plaintiffs, informing them of a proposed change in military household goods rates. All members were informed that their individual rates would cease to apply, and that instead, a common rate would apply. No members objected to such changes, and after approval by the Government, the common rates went into effect. It therefore appears that the individual rates were cancelled by the two supplements, and that thereafter the rates contained in the supplements applied.

The resolution of the case is not as simple as appears in the foregoing para-

graph, however. Defendant has raised some legal arguments which must be first resolved.

Defendant first contends that the cancellation of individual tariffs by blanket cancellation notices issued by the agents violated the individual members' right to free and independent action under paragraph (6) of § 5a of the Interstate Commerce Act, 49 U.S.C. § 5b (1958 ed.) [1]

■ Defendant goes on to state that a carrier party to an agreement is to be accorded the right to take independent action at any time, whether before or after consideration of the procedures of a particular agreement. Such right was not afforded plaintiffs, according to defendant. We disagree that plaintiffs did not have the right of independent action. By letter of September 21, 1961, King was told of the proposal and specifically given an opportunity to reject participation in the blanket cancellation and subsequent new rates. The same information and choice of participation was afforded United in the November 23, 1961, letter from Movers. Both King and United were also *specifically* informed that their respective agent's filing of the proposed supplements did not preclude their rights to independent action—King, by letter of November 13, 1961, from Movers, and United by letter of November 23, 1961. In light of the above, it appears that defendant's contention that no right of independent action was afforded either plaintiff is without merit.

Defendant next contends that the procedure followed by the agents for the approval of the two supplements is not suitable for joint action regarding Section 22 Quotations. In support of this contention, defendant relies upon Southern Motor Carriers—Agreement, 323

I.C.C. 396 (1964). In that case, a divided Commission held that in order for an agent and member carriers to hold meetings for joint consideration of rate charges to apply on Section 22 shipments, the agency agreements must first include provisions containing specific procedures for consideration of Section 22 Quotations.

This court stated in Western Pacific Railroad Company v. United States, 131 F.Supp. 921, 923, 132 Ct.Cl. 150, 153 (1955):

> While it is probable that this court has jurisdiction to make a decision different from that reached by the Interstate Commerce Commission, we are not disposed to do so, *unless the circumstances are very unusual.* The Commission has had wide experience in problems of this kind and is especially equipped to deal with them. [Emphasis supplied.]

We believe there is an unusual circumstance present in the case now before the court which precludes us from following the Commission. Here the Commission had approved an article in both Movers' and Household's By-Laws which provided that Movers and Household could publish Section 22 Quotations. The 1964 case, Southern Motor Carriers—Agreement, supra, did not concern an association whose by-laws had *already* been approved, and had therefore acted in reliance on such approval. Therefore, we need not follow that case in this instance.

■ Finally, defendant alleges that the association did not follow the applicable Interstate Commerce Commission regulation, namely 49 C.F.R. § 149.5 (F) which provides:

> (F) *Quotation or tender superseding prior one.* A quotation or tender which supersedes a prior quotation

---

1. 5b *Agreements between carriers.*
       *       *       *       *       *
   (6) *Agreements for determining matters through joint consideration.*
   The Commission shall not approve under this section any agreement which establishes a procedure for the determination of any matter through joint consideration unless it finds that under the agreement there is accorded to each party the free and unrestrained right to take independent action either before or after any determination arrived at through such procedure.

or tender shall, by a statement shown immediately under the number of the new document cancel the prior document by number.

Defendant maintains that the blanket cancellations violated this regulation. We do not agree. We believe that the blanket cancellation notices which stated that *all* rate tenders *were cancelled,* sufficiently complied with the regulation requiring listing by numbers. The listing of some 1,700 numbers to be cancelled would be quite an onerous task to thrust upon the agents. The same result was accomplished by the use of the word "all" in the cancellation.

Accordingly, we hold that plaintiffs are entitled to recover. Judgment is therefore entered in favor of plaintiff United Van Lines in the sum of $5,270.88; and judgment is entered in favor of plaintiff King Van Lines in the sum of $1,491.81.